UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TERRELL LEE EMBRY,

        Petitioner,                                 Hon. Wendell A. Miles

v.                                                   Case No. 1:02-CV-361

KURT JONES,

        Respondent.
_____/


**REPORT AND RECOMMENDATION**

This matter is before the Court on Embry's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the Court recommends that Embry's petition be **denied**.


**BACKGROUND**

In the early morning hours of April 5, 1998, Melva Culp hosted a party at her townhouse, at which approximately 50-60 people were present. (Trial Transcript, October 26, 1998, 201-03, 248, 280-81; Trial Transcript, October 27, 1998, 42). Culp charged her guests a small cover charge. (Trial Transcript, October 26, 1998, 205-06; Trial Transcript, October 27, 1998, 42). This payment was not for the purpose of providing alcohol or any other product or service, but was instead designed to help

Culp cover her anticipated post-party cleaning costs.  (Trial Transcript, October 26, 1998, 205-06; Trial Transcript, October 27, 1998, 42).

Terrence Hill, Antoine Benson, and Petitioner arrived together at Culp's townhouse at approximately 3:00 a.m.  (Trial Transcript, October 27, 1998, 158-59; Trial Transcript, October 28, 1998, 11-14).  The trio paid five dollars to enter the party.  (Trial Transcript, October 27, 1998, 158-59; Trial Transcript, October 28, 1998, 14).  Shortly after arriving, however, Petitioner began arguing with Alvin Oglesby, who was present at Culp's request "to make sure that nobody started any fights and things like that."  (Trial Transcript, October 26, 1998, 216-20, 251-52, 282-87; Trial Transcript, October 27, 1998, 44-46, 158-60; Trial Transcript, October 28, 1998, 14-16).  Petitioner, apparently under the impression that the cover charge included a supply of alcohol, was upset that "there was no drinks."  (Trial Transcript, October 26, 1998, 217, 251; Trial Transcript, October 27, 1998, 159-60; Trial Transcript, October 28, 1998, 15).

After an exchange of words, Oglesby told Petitioner, "you don't want none of me," to which Petitioner responded, "no, you don't want none of me."  (Trial Transcript, October 26, 1998, 252).  The argument between Petitioner and Oglesby became "heated" and the two were talking "pretty loud."  (Trial Transcript, October 26, 1998, 253-54; Trial Transcript, October 28, 1998, 16).  At this point, Hill informed Culp that if she would give them their money back he would get Petitioner to leave.  (Trial Transcript, October 28, 1998, 16).  Petitioner, Hill, and Benson were given their five dollars back, at which point they left the party.  (Trial Transcript, October 26, 1998, 220, 255-56; Trial Transcript, October 27, 1998, 162; Trial Transcript, October 28, 1998, 17-18).

As they departed, Petitioner shouted an obscenity at Oglesby.  (Trial Transcript, October 27, 1998, 46).  Petitioner was mad when he left the party and as he left he was heard yelling a string of

obscenities such as "punk ass mother fuckers" and "bitch ass niggers." *Id.* at 47-48, 62. While at the party Petitioner did not appear to be drunk and he spoke and walked without difficulty. (Trial Transcript, October 26, 1998, 257-59; Trial Transcript, October 27, 1998, 248; Trial Transcript, October 28, 1998, 48-50). There were no other fights or incidents at Culp's party prior to the incident for which Petitioner was convicted. (Trial Transcript, October 26, 1998, 238).

After departing Culp's residence, Petitioner, Hill, and Benson immediately drove to Tasha Embry's (Petitioner's sister) house. (Trial Transcript, October 27, 1998, 164; Trial Transcript, October 28, 1998, 18). Petitioner entered the house and returned with a long box "about. . .three foot long" in which a 9 mm rifle was located. (Trial Transcript, October 27, 1998, 164-68; Trial Transcript, October 28, 1998, 18-20). Petitioner told Hill, who was driving, "we going back to the party." (Trial Transcript, October 28, 1998, 20). Hill responded, "no we're not going back to the party." Petitioner became insistent, telling Hill that "we going to this mother fucking party." *Id.* When Hill asked Petitioner, "why, why you want to go back to the party for?," Petitioner responded, "bitch, we going back to the party. Fuck that. We going back to the party." *Id.* at 20-21.

When they returned to the complex in which Culp's townhouse was located, Petitioner told Hill to park in the back. (Trial Transcript, October 27, 1998, 168; Trial Transcript, October 28, 1998, 21). Petitioner grabbed his gun and exited the car. (Trial Transcript, October 27, 1998, 168; Trial Transcript, October 28, 1998, 22). Petitioner instructed Hill to "wait right here" and then began walking toward Culp's residence. (Trial Transcript, October 27, 1998, 168; Trial Transcript, October 28, 1998, 22). Benson followed Petitioner and tried to "talk him out of it." (Trial Transcript, October 27, 1998, 168). Benson urged Petitioner that if he wanted to fight somebody he should "fight with [his] fists, not with no gun or nothing." *Id.* at 169-70. Petitioner responded to Benson by raising his weapon in the air

and firing a single shot, after which Benson "ran back to the car." *Id.* at 168-71. While he was running, Benson heard "a couple more shots," after which Petitioner ran back towards the car carrying his weapon. *Id.* at 171.

After placing his weapon in the back seat of the car, Petitioner said, "let's go." (Trial Transcript, October 27, 1998, 171-72; Trial Transcript, October 28, 1998, 24). At Petitioner's direction, Hill drive the trio to Tasha Embry's house. (Trial Transcript, October 27, 1998, 172-73; Trial Transcript, October 28, 1998, 25). When they arrived, Petitioner hid the weapon under Embry's couch. (Trial Transcript, October 27, 1998, 172-73; Trial Transcript, October 28, 1998, 25-27). Petitioner, Benson, and Hill all agreed that if questioned about the shooting incident each would reply that they attended the party, but did not return after leaving. (Trial Transcript, October 28, 1998, 28). Hill then drove Benson to his girlfriend's house, drove Petitioner back to Embry's house, and then returned home. *Id.* at 28-29.

One of the bullets which Petitioner fired at Culp's residence struck Michelle Cox in the back, traveled through her thoracic cavity, struck her heart, and exited through her chest. (Trial Transcript, October 26, 1998, 224-25, 259-61, 289; Trial Transcript, October 27, 1998, 20-27, 78-80). Cox died almost immediately. (Trial Transcript, October 27, 1998, 6-11, 20-27). While the doctor performing the autopsy was unable to recover a bullet from Cox's body he did testify that Cox's wound was consistent with that produced by a 9 mm weapon. *Id.* at 32-34. Police officers did recover several bullets from inside Culp's townhouse. *Id.* at 100-09.

Later that morning Hill watched a television report describing the shooting, including the fact that Michelle Cox had been killed. (Trial Transcript, October 28, 1998, 30-31). Soon thereafter, Hill phoned Petitioner who told Hill to "get over here." *Id.* at 31. When he arrived at Tasha Embry's

house, Hill overheard Embry tell Petitioner, "you all got to get this gun out my mother fucking house." *Id.* Hill then asked Petitioner, "man, what went on over there? What went down?" *Id.* at 32. Petitioner responded that, "we just fucked up. You know, we, it's fucked up man. It was just fucked up."

Embry then threw Petitioner's gun in Hill's vehicle. Hill told Petitioner to "get this out of my car." *Id.* Petitioner picked up the weapon, pointed it at Hill, and instructed him to drive. *Id.* at 32-33. Petitioner directed Hill to a park near the Grand River. *Id.* at 33-34. Petitioner then exited the vehicle carrying his weapon and began walking toward the river. *Id.* at 34. When Petitioner returned a few minutes later he was not carrying anything. *Id.* at 35. Petitioner got back in the vehicle and told Hill, "let's go." *Id.* As they drove back to Tasha Embry's house, Petitioner told Hill, "if anything go down and I get arrested, you going down too cause you helped me get rid of the gun." *Id.* at 35-36.

Later that day, Hill was contacted by members of Petitioner's family and instructed to "stick to the story and don't say nothing." *Id.* at 36-38. Petitioner's brother also told Hill that if "anybody tell on my brother, I'm going to shoot." *Id.* at 41-43. Benson was also contacted by members of Petitioner's family who instructed him to "stick to the story" and report that they "didn't go back to the party and just leave it at that." (Trial Transcript, October 27, 1998, 187-88). Benson also received death threats. *Id.* at 189. When first questioned by the police, Hill and Benson lied as instructed by Petitioner and his family. (Trial Transcript, October 27, 1998, 189; Trial Transcript, October 28, 1998, 38-40, 43-45). However, both subsequently recanted their false statements and cooperated with the police. (Trial Transcript, October 27, 1998, 189-90; Trial Transcript, October 28, 1998, 47).

As part of their investigation the police learned that Petitioner had previously purchased a 9 mm rifle from a local sporting goods store. (Trial Transcript, October 29, 1998, 5-7, 11-16, 79-83). A police dive team subsequently recovered a 9 mm rifle from the Grand River. (Trial Transcript,

October 27, 1998, 125-30; Trial Transcript, October 28, 1998, 146-51). An examination of the serial number of the weapon recovered from the river revealed that it was the same 9 mm rifle which Petitioner purchased from the sporting goods store. (Trial Transcript, October 29, 1998, 16). Ballistics testing revealed that the 9 mm rifle purchased by Petitioner is the only type of weapon that could have fired the bullets recovered from Culp's townhouse. *Id.* at 55-60, 69-71.

Petitioner was subsequently charged with open murder, possession of a firearm during the commission of a felony, discharging a weapon at a building, and possession of a firearm by a felon. (Trial Transcript, October 26, 1998, 11-12). Following a jury trial, Petitioner was found guilty of first degree murder. (Trial Transcript, October 30, 1998, 119). He was also convicted of the other three charges. *Id.* at 119-20. Plaintiff was sentenced to life in prison without the possibility of parole on the murder conviction. (Sentencing Transcript, December 14, 1998, 17). He was further sentenced to terms of 2 years, 4-6 years, 5-7.5 years, on the remaining convictions. *Id.* at 17-19. He appealed his conviction to the Michigan Court of Appeals, asserting the following claims:

> I. The evidence presented was insufficient to sustain a charge of first degree premeditated murder, in violation of Mr. Embry's due process rights under the federal and state constitutions.
>
> II. The trial court reversibly erred in refusing to instruct the jury on an appropriate lesser included misdemeanor offense - reckless, needless, wilful or wanton use, carrying, handling or discharge of a firearm without due caution - which was supported by a rational view of the evidence.
>
> III. Defendant was denied his right to a properly instructed jury and to a fair trial by the failure to give a cautionary instruction regarding Antoine Benson's credibility.

> IV. The prosecuting attorney violated Mr. Embry's state and federal constitutional due process rights to a fair trial by bringing out irrelevant hearsay statements about threats other people made toward witnesses.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Embry*, No. 216505, Opinion (Mich. Ct. App., July 25, 2000). Asserting the same issues, Petitioner subsequently submitted in the Michigan Supreme Court a delayed application for leave to appeal. The court denied Petitioner's request. *People v. Embry*, No. 117716, Order (Mich., February 26, 2001). On May 22, 2002, Embry filed the present petition for writ of habeas corpus in which he asserts the following claims:

> I. Petitioner's conviction for first degree premeditated murder was violative of due process, where the evidence was insufficient as a matter of law to sustain a verdict of guilty beyond a reasonable doubt.
>
> II. Petitioner was denied his federal due process right to a fair trial through prosecutorial misconduct.

## STANDARD OF REVIEW

Embry's petition, filed May 22, 2002, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

>   > law, as determined by the Supreme Court of the United States, or
>
>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather,

the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular...case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## ANALYSIS

**I.        Sufficiency of the Evidence Claim**

Petitioner asserts that he is entitled to habeas relief because there did not exist sufficient evidence to support his conviction for first degree murder.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).

Under Michigan law then in effect, the elements of first degree murder were: (1) the defendant intentionally killed the victim, and (2) the act of killing was premeditated and deliberate. *See People v. Anderson*, 531 N.W.2d 780, 786 (Mich. Ct. App. 1995). Premeditation and deliberation require "sufficient time to allow the defendant to take a second look." *Id.* The elements of first degree murder "may be inferred from all the facts and circumstances surrounding the incident." *People v. Haywood*, 530 N.W.2d 497, 503 (Mich. Ct. App. 1995) (premeditation and deliberation may be inferred from circumstances); *People v. Price*, 1997 WL 33353593 at *1 (Mich. Ct. App., Mar. 7, 1997) (intent may be inferred from circumstances). Moreover, intent to kill may be inferred from the use of a lethal weapon or "from conduct the natural tendency of which is to cause death or great bodily harm." *See Price*, 1997 WL 33353593 at *1 (citing *People v. Ray*, 224 N.W.2d 735 (1974)).

Petitioner first asserts that the evidence was insufficient to establish that he acted with the specific intent to kill. Petitioner claims that he did not say anything, either before or after the shooting, which would indicate that he possessed the specific intent to kill. Petitioner also claims that he did not act with the intent to kill because "there was no showing that [he] even shot at a particular person." Finally, Petitioner asserts that "the evidence was also clear that [he] was drunk at the time, a fact which would negate the specific intent to kill."

While Petitioner may not have expressly stated that he intended to kill anyone, it was certainly reasonable for the jury to infer from the totally of the circumstances that Petitioner acted with the intent to kill. Petitioner's actions from the moment he left the party until he disposed of the weapon in the Grand River all support the inference that Petitioner acted with the requisite intent to kill. This inference is further supported by the fact that Petitioner resorted to the use of a lethal weapon.

Petitioner disputes that the use of a lethal weapon is sufficient by itself to establish that he acted with an intent to kill. However, the authority to which Petitioner cites in support of this proposition, *People v. Vinunzo*, 180 N.W.2d 502 (Mich. 1920) and *People v. Hoffmeister*, 229 N.W.2d 305 (Mich. 1975), does not support his position. In *Vinunzo*, the Michigan Supreme Court stated that:

> The use of a lethal weapon is not in itself sufficient evidence to warrant a verdict of murder in the first degree, but in addition to this there must be evidence in the case, as to circumstances surrounding the killing or the manner in which the weapon is used, from which a logical inference may be drawn that there was willfulness, deliberation, and premeditation.

*Vinunzo*, 180 N.W.2d at 503. The *Hoffmeister* court quoted this language for the proposition that the use of a lethal weapon "is not sufficient to support a conviction of first-degree murder." *Hoffmeister*, 229 N.W.2d at 308.

These two cases clearly state that the use of a lethal weapon is insufficient, with nothing more, to support a conviction for first degree murder. However, neither of these cases stand for the proposition that the use of a lethal weapon is insufficient to establish that the actor intended to kill his victim. To the contrary, the notion that the intent to kill may be inferred from the use of a lethal weapon is clearly implicit in each of the decisions on which Petitioner relies.

The two elements of first degree murder are (1) intent to kill and (2) premeditation and deliberation. In each of the cited cases, the court concluded that the use of a lethal weapon would

support a conviction for first degree murder if there was also evidence of premeditation and deliberation. If the use of a lethal weapon in conjunction with evidence of premeditation and deliberation is sufficient to support a conviction for first degree murder, than implicit in these courts' reasoning is that the use of lethal weapon is sufficient to support a finding that the defendant acted with the intent to kill. Moreover, even if the use of a lethal weapon was not by itself sufficient to find that Petitioner acted with the intent to kill, as discussed above the totality of the circumstances (of which the use of a lethal weapon was but a single component) is sufficient to conclude that Petitioner acted with the requisite intent to kill.

Petitioner's argument that because he did not fire his weapon at any specific person it was error to find that he acted with the requisite intent to kill is contrary to Michigan law. Under the doctrine of transferred intent, the prosecution was not required to establish that Petitioner intended to kill any particular person, but instead only had to establish that Petitioner "intended to kill someone." *See People v. Edwards*, 1996 WL 33357052 at *2 (Mich. Ct. App., Oct. 4, 1996) (citing *People v. Lawton*, 492 N.W.2d 810 (1992)). As previously discussed, the evidence at trial was sufficient to conclude that Petitioner acted with the intent to kill somebody. Thus, the fact that he may not have specifically intended to kill Cox is irrelevant.

Finally, Petitioner's claim that he was so intoxicated at the time of the shooting that he could not have possessed the specific intent to kill is not supported by the evidence. While the evidence revealed that Petitioner had consumed alcohol before arriving at Culp's residence, the record does not support the conclusion that Petitioner was so intoxicated that he was incapable of forming the intent to kill. Melva Culp testified that when Petitioner arrived at the party he was "calm." (Trial Transcript,

October 26, 1998, 219).  Alvin Oglesby testified that Petitioner did not appear to be drunk or otherwise intoxicated and, furthermore, did not exhibit any difficulty walking or speaking.  *Id.* at 257-59.

Antoine Benson testified that while Petitioner had been drinking earlier in the evening he was not so intoxicated that he did not realize what he was doing.  (Trial Transcript, October 27, 1998, 257).  For example, Benson testified that immediately before departing for Culp's residence Petitioner had been able to drive a vehicle without difficulty.  *Id.* at 247.  Benson testified that Petitioner did not consume any alcohol at Culp's party and was able to walk without difficulty.  *Id.* at 201, 248.  Benson further testified that Petitioner was able to load his weapon without difficulty.  *Id.* at 249.  Terrence Hill testified that Petitioner experienced no difficulty walking, running, or communicating.  (Trial Transcript, October 28, 1998, 48-50).  It must also be remembered that Petitioner was able to accurately fire his weapon at Culp's residence several times from long range, after which he ran back to the car without difficulty.  When viewed in a light most favorable to the prosecution, this evidence supports the conclusion that Petitioner was not so intoxicated that he was unable to form the requisite intent to kill.

Petitioner also asserts that there was insufficient evidence to support the conclusion that he acted with premeditation and deliberation.  As previously observed, premeditation and deliberation require "sufficient time to allow the defendant to take a second look."  First, the amount of time which passed between the incident at Culp's residence and the fatal shooting was sufficient for Petitioner to reconsider his actions several dozen times.  Moreover, considering that Petitioner rejected multiple pleas by Benson and Hill to reconsider his actions, there exists direct evidence that Petitioner did, in fact, take "a second look" and nonetheless decided to continue on his chosen course of action.

The Michigan Court of Appeals determined that Petitioner's sufficiency of the evidence claim was without merit.  *People v. Embry*, No. 216505, Opinion at 1-2 (Mich. Ct. App., July 25, 2000).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**II.        Prosecutorial Misconduct Claim**

Petitioner asserts that because of several instances of alleged prosecutorial misconduct his conviction is unconstitutional and must be overturned. In support of this argument, Petitioner points to the following three events.

When Terrence Hill testified he was questioned about threats made to him by members of Petitioner's family. Despite Petitioner's objections, the trial judge permitted Hill to testify that Petitioner's brother informed him that if "anybody tell on my brother, I'm going to shoot." (Trial Transcript, October 28, 1998, 41-43).

Kathy Benson was questioned about alleged statements made by Petitioner's mother to her son, Antoine Benson. Kathy Benson testified that Petitioner's mother, Sophie Embry, instructed Antoine Benson to "stick to the story." (Trial Transcript, October 27, 1998, 264-68). Petitioner objected to this testimony on hearsay grounds. *Id.* at 269. The trial court agreed and instructed the jury to disregard Kathy Benson's comments. *Id.* Finally, in his rebuttal argument to the jury, the prosecuting attorney stated that

> And [Petitioner] makes it significant that Lorna Lane couldn't pick the defendant out. Lorna Lane still lives next to the Embry family, Tasha Embry. I would submit to you that there's a reason maybe she shouldn't want to make an identification in the courtroom with the family sitting right there. A family that we know made threats, made a, there was a threat that Sophia Flower made as Terry Hill walked off the stand when

-14-

> you walked out on a break that you heard about. And that was that
> people open their mouths too much, or they should keep their mouth shut,
> something along that line.

(Trial Transcript, October 30, 1998, 83-84).

As the Sixth Circuit has stated, "[w]hen a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct was "so egregious so as to render the entire trial fundamentally unfair." *Serra*, 4 F.3d at 1355. When a federal habeas court considers the extent of any prosecutorial misconduct, the following factors are to be considered:

> the degree to which the remarks complained of have a tendency to
> mislead the jury and to prejudice the accused; whether they are isolated
> or extensive; whether they were deliberately or accidentally placed before
> the jury, and the strength of the competent proof to establish the guilt of
> the accused.

*Id.* at 1355-56.

With respect to Terrence Hill's testimony, the Court fails to discern how it constitutes prosecutorial misconduct for the prosecutor to elicit testimony which the trial judge specifically permitted over Petitioner's objection. As for Kathy Benson's testimony, the Court again fails to perceive any misconduct. Petitioner's objection to Benson's testimony was sustained and the jury was instructed to disregard the disputed testimony. The prosecutor did not attempt to subvert or disregard the court's ruling by attempting to elicit the testimony by other means, but instead simply initiated a separate line of questioning.

Finally, with respect to the disputed comments made by the prosecutor in his rebuttal argument to the jury, Petitioner asserts that the prosecutor was improperly "referring to testimony that

had been stricken." Petitioner claims that the prosecutor's statement "was, in effect, unsworn testimony by the prosecutor himself." Petitioner is mistaken, as the prosecutor's comments referred to testimony which was properly elicited at trial. Terrence Hill testified that earlier that day, during a break in the proceedings, Sophie, a member of Petitioner's family, told him that "some people need to keep their damn mouth shut."[1] (Trial Transcript, October 28, 1998, 120-21).

The Michigan Court of Appeals determined that Petitioner's claim of prosecutorial misconduct was without merit. *People v. Embry*, No. 216505, Opinion at 3-4 (Mich. Ct. App., July 25, 2000). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the Court concludes that Petitioner is not being confined in violation of the United States Constitution. Accordingly, the Court recommends that his petition for writ of habeas corpus be **denied**.

---

[1] As noted above, Sophie Embry is Petitioner's mother. Antoine Benson's girlfriend was named Flower. (Trial Testimony, October 27, 1998, 265). Thus, in his statement to the jury, the prosecutor appears to have mistakenly referred to Petitioner's mother as Sophie Flower instead of Sophie Embry.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: June 8, 2005 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge